No. 2024-1346

# United States Court of Appeals
# for the Federal Circuit

CORCEPT THERAPEUTICS, INC.,

*Plaintiff-Appellant,*

*v.*

TEVA PHARMACEUTICALS USA, INC.,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of New Jersey in No. 1:18-cv-03632-RMB-LDW,
Honorable Renée Marie Bumb, Chief Judge

## TEVA'S RESPONSIVE BRIEF

John Christopher Rozendaal
Michael E. Joffre
Uma N. Everett
William H. Milliken
Anna G. Phillips
Brady P. Gleason
STERNE KESSLER GOLDSTEIN & FOX PLLC
1101 K Street, NW
Floor 10
Washington, DC 20005
(202) 371-2600

*Counsel for Defendant-Appellee*
*Teva Pharmaceuticals USA, Inc.*

April 22, 2024

# PATENT CLAIMS AT ISSUE

## Claims 10–13 of U.S. Patent No. 10,195,214:

10. A method of controlling hyperglycemia secondary to hypercortisolism in a patient with endogenous Cushing's syndrome who is taking an original once-daily dose of 1200 mg or 900 mg per day of mifepristone, comprising the steps of:

reducing the original once-daily dose to an adjusted once-daily dose of 600 mg mifepristone,

administering the adjusted once-daily dose of 600 mg mifepristone and a strong CYP3A inhibitor to the patient,

wherein said strong CYP3A inhibitor is selected from the group consisting of ketoconazole, itraconazole, nefazodone, ritonavir, nelfmavir, indinavir, boceprevir, clarithromycin, conivaptan, lopinavir, posaconazole, saquinavir, telaprevir, cobicistat, troleandomycin, tipranivir, paritaprevir and voriconazole.

11. The method of claim 10, wherein said CYP3A inhibitor is ketoconazole.

12. The method of claim 10, wherein said CYP3A inhibitor is itraconazole.

13. The method of claim 10, wherein said CYP3A inhibitor is clarithromycin.

Appx86–87.

**Claims 1, 6, 7, and 9 of U.S. Patent No. 10,842,800:**

1. A method of controlling hyperglycemia secondary to hypercortisolism in a patient with endogenous Cushing's syndrome, said patient taking an original once-daily dose of 1200 mg per day of mifepristone, the method comprising the steps of:

reducing the original once-daily dose to an adjusted once-daily dose of 900 milligrams (mg) per day of mifepristone, and

administering the adjusted once-daily dose of 900 mg per day of mifepristone and a strong CYP3A inhibitor to the patient,

wherein said strong CYP3A inhibitor is selected from the group consisting of ketoconazole, itraconazole, nefazodone, ritonavir, nelfinavir, boceprevir, clarithromycin, conivaptan, lopinavir, saquinavir, telaprevir, cobicistat, troleandomycin, tipranivir, and paritaprevir.

6. A method of controlling hyperglycemia secondary to hypercortisolism in a patient with endogenous Cushing's syndrome, said patient taking a strong CYP3A inhibitor selected from ketoconazole, itraconazole, nefazodone, ritonavir, nelfinavir, indinavir, boceprevir, clarithromycin, conivaptan, lopinavir, posaconazole, saquinavir, telaprevir, cobicistat, troleandomycin, tipranivir, paritaprevir and voriconazole, the method comprising administering to the patient a once-daily dose of mifepristone of 900 milligrams (mg) per day.

7. The method of claim 6, wherein said CYP3A inhibitor is ketoconazole.

9. The method of claim 6, wherein said CYP3A inhibitor is itraconazole.

Appx128.

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2024-1346 |
| **Short Case Caption** | Corcept Therapeutics, Inc. v. Teva Pharmaceuticals USA, Inc |
| **Filing Party/Entity** | Teva Pharmaceuticals USA, Inc. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 04/22/2024

Signature: /s/ John Christopher Rozendaal

Name: John Christopher Rozendaal

**FORM 9. Certificate of Interest**

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Teva Pharmaceuticals USA, Inc. | | Teva Pharmaceutical Industries Ltd., |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐     Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| LIZA M. WALSH<br>WALSH PIZZI O'REILLY FALANGA LLP | CHRISTINE INTROMASSO GANNON<br>WALSH PIZZI O'REILLY FALANGA LLP | ELEONORE OFOSU-ANTWI<br>WALSH PIZZI O'REILLY FALANGA LLP |
| HECTOR DANIEL RUIZ<br>WALSH PIZZI O'REILLY FALANGA LLP | JESSICA K. FORMICHELLA<br>WALSH PIZZI O'REILLY FALANGA LLP | LAUREN RUTH MALAKOFF<br>WALSH PIZZI O'REILLY FALANGA LLP |
| WILLIAM T. WALSH , JR<br>WALSH PIZZI O'REILLY FALANGA LLP | ZAHIRE DESIREE ESTRELLA-CHAMBERS<br>KEAN UNIVERSITY | Brooke N. McLain<br>Sterne Kessler Goldstein & Fox PLLC4 |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)    ☑   No    ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES .................................................................. vi

INTRODUCTION ........................................................................................1

STATEMENT OF THE ISSUES .........................................................................3

STATEMENT OF THE CASE ..........................................................................3

    A.    Factual background ............................................................................3

        1.    Researchers begin treating Cushing's syndrome with mifepristone in the 1980s...........................................................3

        2.    The FDA approves Korlym in 2012 but requires Corcept to (i) include in the label warnings against co-administration of mifepristone and strong CYP3A inhibitors and (ii) conduct a drug-drug interaction study involving strong CYP3A inhibitors. ...........................................5

        3.    Corcept conducts the required drug-drug interaction study and obtains the asserted patents. .....................................7

        4.    Corcept updates the Korlym label in 2019 to account for the study results but retains the warnings about co-administration. ........................................................9

    B.    Proceedings before the district court.................................................10

        1.    Corcept sues Teva for infringement........................................10

        2.    The district court holds trial on a single issue: whether Teva will induce infringement of the '214 and '800 patents. ....................................................11

        3.    The district court rules in Teva's favor for two independent reasons. .................................................12

SUMMARY OF THE ARGUMENT .....................................................................17

STANDARD OF REVIEW...............................................................................20

ARGUMENT .............................................................................................21

I.    The district court did not clearly err in finding that Teva's mifepristone product will not likely lead to direct infringement. .................21

    A.    Corcept was required to show direct infringement as an element of its case, and its attempts to evade that burden fail..........................22

i

1. Corcept bore the burden to show it is more likely than not that Teva's product, if marketed, would perform all steps of the claimed method—an inquiry that requires analysis of all relevant evidence, including the label and physician practice. ..............................22

2. *Genentech* forecloses Corcept's contention that Teva's label is "dispositive." ...................................23

3. Corcept's assertion that the district court had to analyze the evidence in a specific order is meritless. ...........29

B. The district court supportably concluded that Corcept did not show direct infringement. .......................................30

1. There is no evidence of past infringement. ...............................31

2. Future infringement is unlikely. ................................................33

II. The district court did not clearly err in finding that Teva's label will not induce infringement. ..........................................................................42

A. In the Hatch–Waxman context, inducement liability attaches only if the drug product label recommends, encourages, or promotes infringement; merely describing an infringing use is insufficient. ......................................................................................42

B. The district court supportably found that Teva's label does not recommend, encourage, or promote co-administration of mifepristone and strong CYP3A inhibitors, as required by all asserted claims ..................................................................................45

1. *HZNP* is dispositive. ...........................................................45

2. Teva's label discourages co-administration, as the district court found. ................................................................51

3. Corcept itself told the Patent Office and this Court that the 2012 Korlym label—which tracks Teva's label in key respects—teaches physicians "to avoid use of mifepristone with strong CYP3A inhibitors." .........................54

4. *Vanda* is inapposite. ...............................................................57

5. Corcept's additional arguments concerning claim 6 of the '800 patent are meritless. ................................................59

C.    The district court's finding that Teva's product has substantial non-infringing uses further supports its no-inducement conclusion.................................................59

    1.    Virtually all uses of Teva's product will be non-infringing. ..........................................................60

    2.    Corcept's contention that non-infringing uses are irrelevant to inducement is foreclosed by this Court's precedent. ...................................................61

CONCLUSION ........................................................................62

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbott Lab'ys v. TorPharm, Inc.*,
   300 F.3d 1367 (Fed. Cir. 2002) ................................................................28, 29

*Anderson v. City of Bessemer City, N.C.*,
   470 U.S. 564 (1985)........................................................21, 31, 33, 39

*Biovail Corp. Int'l v. Andrx Pharm., Inc.*,
   239 F.3d 1297 (Fed. Cir. 2001) .................................................................21

*In re Brimonidine Patent Litig.*,
   643 F.3d 1366 (Fed. Cir. 2011) .................................................................28

*Ericsson, Inc. v. D-Link Sys., Inc.*,
   773 F.3d 1201 (Fed. Cir. 2014) ...........................................................45, 52

*First Interstate Bank of Billings v. United States*,
   61 F.3d 876 (Fed. Cir. 1995) .....................................................................21

*Genentech, Inc. v. Sandoz Inc.*,
   55 F.4th 1368 (Fed. Cir. 2022) ...........................................................passim

*Glaxo, Inc. v. Novopharm, Ltd.*,
   110 F.3d 1562 (Fed. Cir. 1997) ....................................................22, 23, 30

*HZNP Medicines LLC v. Actavis Laboratories UT Inc.*,
   940 F.3d 680 (Fed. Cir. 2019) ............................................................passim

*Limelight Networks, Inc. v. Akamai Techs., Inc.*,
   572 U.S. 915 (2014).........................................................................22

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
   545 U.S. 913 (2005)....................................................................43, 44

*Par Pharm., Inc. v. Eagle Pharm., Inc.*,
   44 F.4th 1379 (Fed. Cir. 2022) ................................................................28

iv

*Roche Diagnostics Corp. v. Meso Scale Diagnostics*,
  LLC, 30 F.4th 1109 (Fed. Cir. 2022)....................................................37

*Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*,
  655 F.3d 1364 (Fed. Cir. 2011) ....................................................41, 51

*Sunovion Pharm., Inc. v. Teva Pharm. USA, Inc.*,
  731 F.3d 1271 (Fed. Cir. 2013) .............................................................28

*Takeda Pharm. USA, Inc. v. West-Ward Pharm. Corp.*,
  785 F.3d 625 (Fed. Cir. 2015) .........................................26, 43, 44, 53

*Vanda Pharms. Inc. v. W.-Ward Pharms. Int'l Ltd.*,
  887 F.3d 1117 (Fed. Cir. 2018) ....................................................*passim*

*Vita-Mix Corp. v. Basic Holding, Inc.*,
  581 F.3d 1317 (Fed. Cir. 2009) .............................................................60

*Warner-Lambert Co. v. Apotex Corp.*,
  316 F.3d 1348 (Fed. Cir. 2003) .........................................20, 60, 61

**Statutes**

35 U.S.C. § 271(e)(2)................................................................................22

## STATEMENT OF RELATED CASES

No other appeal in or from the same civil action or proceeding in the district court was previously before this or any other appellate court. Counsel is not aware of any case pending in this or any other tribunal that will directly affect or be directly affected by this Court's decision in the pending case.

# INTRODUCTION

This is a Hatch–Waxman case involving mifepristone, a drug indicated to treat certain patients with an endocrine disorder called Cushing's syndrome. After Teva sought FDA approval to market a generic mifepristone product, Corcept accused Teva of inducing infringement of nine method-of-treatment patents. By the time of trial, only two patents remained. Each requires co-administration of mifepristone and a class of drugs called strong CYP3A inhibitors in a specific order and at specific doses.

Corcept lost this case on the facts. The district court rejected Corcept's inducement allegations for two independent reasons, each of which turned heavily on the district court's weighing of the evidence and resolution of competing expert testimony: (i) Corcept failed to show that anyone will directly infringe the asserted patents and (ii) Corcept failed to show that Teva specifically intends to induce infringement. The district court repeatedly credited Teva's expert (Dr. Snyder) over Corcept's expert (Dr. Carroll) on these issues. *See* Appx11; Appx30–31; Appx32; Appx33–35; Appx38; Appx43–44. Both findings are well supported; affirmance of either finding is sufficient to resolve this appeal in Teva's favor.

As to direct infringement, there is no evidence that *anyone* has ever practiced these patents. And the district court—after comprehensively analyzing Teva's label and the evidence regarding physician practice, and after repeatedly

1

crediting Teva's expert over Corcept's—concluded as a factual matter that future infringement is unlikely. *See Genentech, Inc. v. Sandoz Inc.*, 55 F.4th 1368, 1380 (Fed. Cir. 2022) (future-infringement inquiry requires consideration of "all the relevant evidence, including [the] proposed label and physician practice"). Corcept does not come close to showing that was clear error. This Court may affirm on that basis alone.

If the Court reaches the issue of specific intent, it will find the district court's conclusions amply supported as well. The court—again crediting Teva's expert over Corcept's—found that Teva's label does not encourage co-administration of mifepristone and strong CYP3A inhibitors, as required by all asserted claims. On the contrary, the label warns *against* co-administration and merely provides dosing regimens for physicians to follow *if*—contrary to Teva's warning—they decide to do it anyway. This Court found no inducement under similar circumstances in *HZNP Medicines LLC v. Actavis Laboratories UT Inc.*, 940 F.3d 680 (Fed. Cir. 2019). Under *HZNP*, a label stating, "If you do X, do Y" does not induce X. *See id.* at 701–02. As the district court correctly concluded, that legal principle resolves this case in Teva's favor. Indeed, this case is *easier* than *HZNP* given the district court's well-supported factual finding that Teva's label cautions against co-administration. The label is not merely agnostic as to infringement (as the defendat's was in *HZNP*); the label recommends against infringement.

2

This Court should affirm.

## STATEMENT OF THE ISSUES

1.      Whether the district court clearly erred in finding that Corcept failed to prove that Teva's mifepristone product will lead to direct infringement if marketed, where the evidence showed that physicians have good reasons to avoid infringing uses; the evidence showed that the development of new, easier-to-dose drugs makes infringing uses unnecessary; and there is no evidence that anyone practiced the claimed methods in the past.

2.      Whether the district court clearly erred in finding that Corcept failed to prove that Teva specifically intends to induce infringement, where Teva's label warns against co-administration of mifepristone and strong CYP3A inhibitors (as required by all asserted claims) and merely describes—without encouraging—both infringing and non-infringing dosing regimens involving the combination in the event that physicians choose not to heed Teva's warning.

## STATEMENT OF THE CASE

### A.      Factual background

#### 1.      Researchers begin treating Cushing's syndrome with mifepristone in the 1980s.

The asserted patents cover specific methods of using mifepristone to treat Cushing's syndrome, an endocrine disorder characterized by excessive levels of the hormone cortisol. Appx8. The excess cortisol is often caused by a tumor in the

adrenal or pituitary glands. Appx9. Surgery (i.e., excision of the tumor) is the

preferred treatment, but medications like mifepristone are available for patients

who have failed surgery or cannot have surgery. Appx9.

Mifepristone was synthesized in the early 1980s and has been used to treat

Cushing's syndrome for almost as long. Appx12. In 1985, a group of researchers

led by Dr. Lynette Nieman—who remains one of the leading experts in the

treatment of Cushing's syndrome today—reported successful treatment of a

Cushing's patient with mifepristone. *See* Appx4554. In the following years, other

researchers investigated the treatment of Cushing's syndrome with mifepristone

and reported positive findings. *See, e.g.*, Appx4780–4786.

Mifepristone treats Cushing's syndrome by blocking cortisol's effects on the

body. It does that by binding to the body's glucocorticoid receptors and thereby

preventing cortisol molecules from binding to them. Appx10. Mifepristone does

not reduce the level of cortisol in the body, however. On the contrary, it can

*increase* cortisol levels, because (due to mifepristone's blockading effect) the body

perceives less cortisol than is actually present, thus prompting the body to make

more cortisol. Appx11; Appx1428–1429 (384:23–385:5) (Snyder). So the

medication is hard to dose. Appx11; Appx1429 (385:14–20) (Snyder).

Other available medications for Cushing's syndrome, including osilodrostat

(a relatively new drug sold under the brand name Isturisa), work by inhibiting the

4

body's production of cortisol. Appx10; Appx11–12; Appx1428 (384:9–12) (Snyder). These medications are easier to dose than mifepristone because physicians can use the patient's cortisol levels to determine whether the dose being administered is sufficient, insufficient, or excessive. Appx11–12; Appx1430 (386:12–22) (Snyder). The district court found that osilodrostat is a particularly attractive treatment for Cushing's syndrome because it is quick, powerful, and relatively easy to dose. Appx11–12; Appx33–34; Appx1430 (386:12–22) (Snyder).

> **2.      The FDA approves Korlym in 2012 but requires Corcept to (i) include in the label warnings against co-administration of mifepristone and strong CYP3A inhibitors and (ii) conduct a drug-drug interaction study involving strong CYP3A inhibitors.**

In the late 2000s, Corcept began seeking FDA approval to market mifepristone to treat Cushing's syndrome. Appx12. The FDA approved Korlym in 2012 for a narrow indication involving a specific subset of Cushing's patients:

> KORLYM (mifepristone) is a cortisol receptor blocker indicated to control hyperglycemia secondary to hypercortisolism in adult patients with endogenous Cushing's syndrome who have type 2 diabetes mellitus or glucose intolerance and have failed surgery or are not candidates for surgery.

Appx4212; Appx12–13.

According to Corcept, the FDA insisted that the label include cautionary language regarding co-administration of mifepristone and strong CYP3A inhibitors. *See* Appx2247–2248; Appx2580. Those warnings were included

because mifepristone was known to be a CYP3A substrate—i.e., it is metabolized by the CYP3A family of enzymes. When a CYP3A inhibitor and a CYP3A substrate are administered to a patient at the same time, the CYP3A inhibitor can decrease the patient's metabolism of the CYP3A substrate and thus increase the blood concentration of the substrate, which can cause an undesirable drug-drug interaction. Appx54 (3:16–32); Appx58–59 (12:14–16, 13:53–63); Appx69 (34:8–23).[1] In the case of mifepristone, co-administration with a strong CYP3A inhibitor can raise blood levels of mifepristone, which could lead to side effects such as hypokalemia (low potassium levels) and hypotension (low blood pressure). These side effects are exceedingly dangerous and potentially fatal. Appx1439 (395:2–8) (Snyder).

The 2012 Korlym label therefore included several warnings concerning co-administration of mifepristone and strong CYP3A inhibitors:

- **"Warnings & Precautions"** – *"Use of Strong CYP3A Inhibitors:* Concomitant use can increase mifepristone plasma levels significantly. Use only when necessary and limit mifepristone dose to 300 mg." Appx4212.

- **"Drug Interactions"** – "Caution should be used when Korlym is used with strong CYP3A inhibitors. Limit mifepristone dose to 300 mg per day when used with strong CYP3A inhibitors." Appx4212.

_____

[1] The two asserted patents share a specification. This brief cites the '214 patent (Appx50–87).

- **"5.6 Use of Strong CYP3A Inhibitors"** – "Korlym should be used with extreme caution in patients taking ketoconazole and other strong inhibitors of CYP3A … as these could substantially increase the concentration of mifepristone in the blood. The benefit of concomitant use of these agents should be carefully weighed against the potential risks. Mifepristone should be used in combination with strong CYP3A inhibitors only when necessary, and in such cases the dose should be limited to 300 mg per day…." Appx4217.

- **"7.2 CYP3A Inhibitors"** – "Medications that inhibit CYP3A could increase plasma mifepristone concentrations and dose reduction of Korlym may be required. Ketoconazole and other strong inhibitors of CYP3A … may increase exposure to mifepristone significantly. The clinical impact of this interaction has not been studied. Therefore, extreme caution should be used when these drugs are prescribed in combination with Korlym. The benefit of concomitant use of these agents should be carefully weighed against the potential risks. The dose of Korlym should be limited to 300 mg and used only when necessary…." Appx4220–4221.

*See* Appx14–15. Corcept told the Patent Office during prosecution of the patents-in-suit that this language "taught clinicians to avoid the concomitant use of mifepristone with strong CYP3A inhibitors." Appx1187 (169:12–18); Appx2272.

The FDA also imposed a post-marketing requirement: as a condition of approval, Corcept had to conduct a drug-drug interaction ("DDI") study quantifying the effect of co-administering a strong CYP3A inhibitor on mifepristone blood levels. Appx2580; *see* Appx13 (citing Appx4297–4303).

### 3.    Corcept conducts the required drug-drug interaction study and obtains the asserted patents.

That study led to the two asserted patents. Appx2580. According to the specification, the DDI study results showed that co-administering mifepristone and

7

strong CYP3A inhibitors increases mifepristone blood concentration by about 30%

relative to administering mifepristone alone. Appx58 (12:26–38). Each patent

claims methods of treating Cushing's syndrome by, among other things,

administering mifepristone together with a strong CYP3A inhibitor in a particular

order and at particular doses.

Claim 10 of the '214 patent is representative of the asserted claims reciting

administration of a strong CYP3A inhibitor to a patient already receiving

mifepristone. It claims

> [a] method of controlling hyperglycemia secondary to hypercortisolism
> in a patient with endogenous Cushing's syndrome who is taking an
> original once-daily dose of 1200 mg or 900 mg per day of mifepristone,
> comprising the steps of:
>
> reducing the original once-daily dose to an adjusted once-daily dose of
> 600 mg mifepristone,
>
> administering the adjusted once-daily dose of 600 mg mifepristone and
> a strong CYP3A inhibitor to the patient,
>
> wherein said strong CYP3A inhibitor is selected from the group
> consisting of ketoconazole, itraconazole, nefazodone, ritonavir,
> nelfmavir, indinavir, boceprevir, clarithromycin, conivaptan, lopinavir,
> posaconazole, saquinavir, telaprevir, cobicistat, troleandomycin,
> tipranivir, paritaprevir and voriconazole.

Appx86 (68:47–63) (spacing enhanced for clarity). Claim 1 of the '800 patent is

virtually identical, except that the required starting dose of mifepristone is 1200 mg

(rather than 1200 or 900 mg) and the specified dose reduction is to 900 mg (rather

than 600 mg). Appx128 (67:30–68:2).

Claim 6 of the '800 patent is representative of the asserted claims reciting administration of mifepristone to a patient already receiving a strong CYP3A inhibitor. It claims

> [a] method of controlling hyperglycemia secondary to hypercortisolism in a patient with endogenous Cushing's syndrome,
>
> said patient taking a strong CYP3A inhibitor selected from ketoconazole, itraconazole, nefazodone, ritonavir, nelfinavir, indinavir, boceprevir, clarithromycin, conivaptan, lopinavir, posaconazole, saquinavir, telaprevir, cobicistat, troleandomycin, tipranivir, paritaprevir and voriconazole,
>
> the method comprising administering to the patient a once-daily dose of mifepristone of 900 milligrams (mg) per day.

Appx128 (68:15–24) (spacing enhanced for clarity).

### 4.    Corcept updates the Korlym label in 2019 to account for the study results but retains the warnings about co-administration.

After completing the DDI study, Corcept revised its label in 2019 to permit administration of up to 900 mg mifepristone with strong CYP3A inhibitors. The revised label otherwise retained almost all the cautionary language concerning the risks of co-administration found in the 2012 label. Appx4235–4256; *see* Appx15–18 (district court's summary of relevant changes between the 2012 and 2019 labels). For example, the 2019 label notes that "[c]oncomitant use can increase mifepristone plasma levels" and therefore should be done "only when necessary." Appx4235; *see* Appx4240 ("KORLYM should be used in combination with strong

CYP3A inhibitors only when necessary, and in such cases the dose should be limited to 900 mg per day."); Appx4245 (similar).

The 2019 label also provides a table specifying the "[a]djustment to dose of mifepristone tablets if adding a strong CYP3A inhibitor":

**Table 1. Dose adjustment of KORLYM when strong CYP3A inhibitor is added**

| Current dose of KORLYM | Adjustment to dose of KORLYM if adding a strong CYP3A inhibitor |
|---|---|
| 300 mg | No change |
| 600 mg | Reduce dose to 300 mg. If clinically indicated, titrate to a maximum of 600 mg |
| 900 mg | Reduce dose to 600 mg. If clinically indicated, titrate to a maximum of 900 mg |
| 1200 mg | Reduce dose to 900 mg |

Appx4238. If Korlym is administered to a patient already taking a strong CYP3A inhibitor, the label states: "Start at a dose of 300 mg. If clinically indicated, titrate to a maximum of 900 mg." Appx4238.

The label for Teva's mifepristone product is substantively identical to the 2019 Korlym label. Appx20 (citing Appx4235–4256; Appx4040–4058).

## B.    Proceedings before the district court

### 1.    Corcept sues Teva for infringement.

Teva filed an Abbreviated New Drug Application (ANDA) seeking approval to market a generic version of Korlym in 2017. Appx20. Corcept then sued Teva, asserting two patents that it subsequently dropped from the litigation. All told, Corcept has asserted nine patents against Teva during the six-year history of this

10

case. By the time of trial, Corcept had dropped all but two: the '214 and '800

patents described above.

### 2. The district court holds trial on a single issue: whether Teva will induce infringement of the '214 and '800 patents.

In 2021, the parties cross-moved for summary judgment concerning

infringement of the '214 patent. (The summary-judgment proceedings did not

involve the '800 patent because Corcept did not assert that patent until 2023.[2]) The

district court denied both motions, stating that it wished to hear expert testimony

regarding how healthcare providers would interpret Teva's label. Appx523.

The case proceeded to a bench trial in September 2023. The court heard live

testimony from inventor Dr. Belanoff as well as Dr. Carroll (Corcept's expert) and

Dr. Snyder (Teva's expert). Appx4 n.1. Both experts are endocrinologists with

extensive experience treating Cushing's syndrome. Dr. Carroll has treated over 75

Cushing's patients in 15 years of practice, *see* Appx455; Appx1224 (206:17–22),

while Dr. Snyder has treated approximately 100 Cushing's patients in 50 years of

practice, *see* Appx1420 (376:24–25); Appx1427 (383:21–24).

---

[2] The post-grant review proceedings in which the '214 patent was found not unpatentable likewise involved only the '214 patent. *Contra* Corcept Br. 10.

### 3.    The district court rules in Teva's favor for two independent reasons.

After hearing the evidence and receiving post-trial briefing, the district court issued a detailed opinion concluding that Corcept failed to prove induced infringement for two independent reasons. *First*, Corcept did not prove future direct infringement because it did "not establish[] that physicians are likely to co-administer mifepristone with a strong CYP3A inhibitor at an infringing sequence and/or dosage." Appx4. *Second*, "Corcept failed to demonstrate that Teva possesses the specific intent to encourage" infringement "because Teva's proposed product label does not clearly 'encourage, recommend, or promote' infringement." Appx4 (quoting *Takeda Pharm. USA, Inc. v. West-Ward Pharm. Corp.*, 785 F.3d 625, 631 (Fed. Cir. 2015)).

### a.    The district court finds that Corcept did not show that Teva's product would lead to direct infringement.

The district court began its direct-infringement analysis by noting "the lack of record evidence demonstrating that anyone has ever practiced the claimed methods." Appx25. Neither party's expert had "ever prescribed mifepristone with a strong CYP3A inhibitor to treat Cushing's syndrome," much less at the claimed doses and in the claimed order, Appx28—a notable fact given that the experts have nearly 70 years of practice experience between them. And Corcept presented no evidence that anyone else "had ever prescribed the drugs together at an infringing

12

sequence and/or dosage." Appx28–29. Citing this Court's decision in *Genentech*, the district court observed that, while Corcept was not *required* to adduce evidence of past infringement to meet its burden of proof, the lack of such evidence was "relevant" and "persuasive." Appx25–28 (quoting *Genentech*'s observation that "past conduct is relevant to what will happen in the future").

The district court did not end its analysis there, however. Rather, expressly "[c]rediting Dr. Snyder's testimony," the district court also found it "highly unlikely that physicians will practice the claimed methods" in the future, for several reasons. Appx31.

*First*, the evidence showed that "physicians generally avoid co-administering mifepristone and strong CYP3A inhibitors …. because of the challenges of dosing mifepristone and the dangers associated with co-administering the two substances." Appx31. The court found "persuasive[]" Dr. Snyder's testimony "that physicians should 'be very afraid' of co-administration" because "it could cause a 'problem.'" Appx32 (quoting Appx1438 (394:11); Appx1441 (397:22)). The court also noted that Corcept's own medical director, Dr. Moraitis, "reported that he strongly prefers monotherapy because of the possibility of adverse drug-drug interactions." Appx32 (citing Appx1098–1099). And the court found it "significant that Dr. Lynette Nieman, a leading authority on the treatment of Cushing's syndrome, did not mention combining mifepristone

with other drugs in a topic review of hers published in UpToDate," a widely used medical periodical. Appx32–33.

*Second*, the district court cited the availability of an alternative treatment that avoids the risks associated with co-administering mifepristone and strong CYP3A inhibitors: osilodrostat. Appx33. Osilodrostat, the evidence showed, is a "'powerful' and 'effective' drug that 'acts rapidly'" to treat Cushing's and is easier to dose than mifepristone. Appx33. Again crediting Dr. Snyder, the court found that "physicians are unlikely to co-administer mifepristone and strong CYP3A inhibitors in the future because osilodrostat is a better drug to treat Cushing's syndrome." Appx33–34. Osilodrostat presents less of a risk of adverse drug-drug interactions when co-administered with strong CYP3A inhibitors because, unlike with mifepristone, "one can measure cortisol and know if one's giving the right dose" of osilodrostat. Appx1533 (489:3–24) (Snyder).

*Third*, the court found that Teva's label "cautions against co-administration" and that a physician who nonetheless decided to co-administer "could follow the instructions on Teva's label and not infringe." Appx35. For example, as Corcept's expert Dr. Carroll admitted, "administering 300 mg mifepristone to a patient who is already taking a strong CYP3A inhibitor would not infringe claim 6 of the '800 patent." Appx35 (citing Appx1285–1286 (267:5–9, 268:5–12)) (emphasis omitted). "Nor would administering 600 mg of mifepristone." Appx35 (emphasis

14

omitted). "Similarly"—as Dr. Carroll also admitted—"a physician who administers a strong CYP3A inhibitor to a patient who is already taking 300 mg or 600 mg of mifepristone would not infringe claim 10 of the '214 patent or claim 1 of the '800 patent." Appx36 (citing Appx1279–1282 (261:14–264:8)) (emphasis omitted). All these dosing regimens are described on Teva's label, but none of them infringes. Appx35–36.

Corcept had argued that infringement was likely "because most patients require 900 mg or 1200 mg of mifepristone to achieve an efficacious result." Appx36. The suggested implication was that, if such a patient were to take a strong CYP3A inhibitor with those doses of mifepristone, infringement could result. Appx36–37. The district court rejected this argument on the facts, noting that Corcept had adduced no evidence supporting its speculation that most patients need 900 or 1200 mg mifepristone or that any such patients have taken or will take mifepristone with a strong CYP3A inhibitor. Appx36–37.

### b. The district court finds that Corcept did not show that Teva possesses specific intent to induce.

The district court determined that this Court's decision in *HZNP* disposed of Corcept's specific-intent arguments. *HZNP* held that a product label for a topical solution instructing users to wait for the treated area to dry before applying a second substance did not induce infringement of a patent requiring (i) application

15

of the solution, (ii) waiting for the area to dry, and (iii) applying a second substance. *HZNP*, 940 F.3d at 699–702. The accused label, *HZNP* reasoned, recommended "only the first step of this method, nothing else." *Id.* at 702.

The district court concluded that, "[j]ust as the product label in *HZNP* did not encourage, promote, or recommend the specified steps of the patented method because nothing required post-product application of … another substance, Teva's label does not encourage co-administration of mifepristone and a strong CYP3A inhibitor." Appx40–41. "The label only provides instructions *how* to co-administer the substances to achieve an efficacious result *if* a physician determines that it is medically necessary," Appx41—which was "unlikely" to happen, Appx42. "In this context," the court explained, "the label only provides 'guidance' for physicians; it does not teach an infringing use 'such that we are willing to infer from those instructions an affirmative intent to infringe the patent.'" Appx41 (quoting *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1329 n.2 (Fed. Cir. 2009)).

The district court also "emphasiz[ed]" two additional points. Appx42. *First*, Teva's label "does not outline any benefits of co-administration or indicate the circumstances in which the agents should be co-administered." Appx42. Again crediting Dr. Snyder's testimony, the court found that "physicians would read Teva's label as a warning not to co-administer mifepristone and a strong CYP3A inhibitor." Appx43. Indeed, Corcept itself told the Patent Office during prosecution

16

that *nearly identical* language in the 2012 Korlym label "represented a 'forceful' warning against coadministration." Appx42 n.8. *Second*, the court noted that, "in the unlikely event that a physician decides to co-administer mifepristone with a strong CYP3A inhibitor, Teva's label does not provide exclusively infringing instructions." Appx44. "Said differently, Teva's label permits non-infringing options for co-administering the substances"—meaning infringement "cannot be assumed." Appx44 (citing *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1364–65 (Fed. Cir. 2003)).

The district court therefore entered judgment in Teva's favor. Appx48–49.

## SUMMARY OF THE ARGUMENT

The district court ruled in Teva's favor for two independent reasons: Corcept failed to prove direct infringement and failed to prove specific intent. To prevail on appeal, Corcept must show that both determinations were clearly erroneous. Corcept cannot make that showing for either issue, let alone both.

1.    The district court did not clearly err in concluding that Corcept failed to prove that Teva's product, if marketed, would lead to direct infringement.

a.    A patentee asserting induced infringement must prove an underlying act of direct infringement. In the Hatch–Waxman context, the patentee may satisfy that predicate by proving that the generic ANDA product, if marketed, would infringe. *See Genentech*, 55 F.4th at 1379. Corcept's repeated contentions (e.g., at

17

46) that it did not need to prove future infringement and instead could satisfy its burden merely by showing that "the ANDA label instructs an infringing use" are thus incorrect. Indeed, the patentee in *Genentech* made the same argument, and this Court rejected it. *See id.* Corcept therefore had to show that physicians will co-administer mifepristone and strong CYP3A inhibitors in the particular order and at the particular doses called for by the asserted claims.

b.    The district court did not clearly err in finding that Corcept failed to meet this burden. There is—undisputedly—no record evidence that anyone has ever practiced the asserted claims. As *Genentech* observed, "past conduct is relevant to what will happen in the future." *Id.*

The district court concluded that Corcept failed to meet its burden on direct infringement for several additional reasons, each well supported in the record. *First*, physicians try to avoid co-administering mifepristone and strong CYP3A inhibitors because of a risk of drug-drug interactions. *Second*, physicians are unlikely to find co-administration necessary in the future because of the availability of osilodrostat, a recently approved drug that is easier to dose in combination with strong CYP3A inhibitors. *Third*, Teva's product label warns against co-administration of mifepristone and strong CYP3A inhibitors and in any event describes non-infringing dosing regimens that a physician could follow in the unlikely event she were to co-administer. In making these findings, the district

18

court repeatedly credited Teva's expert testimony over Corcept's. Credibility

determinations of this sort can virtually never be clear error.

2.     Nor did the district court clearly err in concluding that Corcept failed

to prove specific intent to induce infringement.

a.     To prove inducement, Corcept had to show that Teva's label instructs,

recommends, or promotes infringement. Contrary to Corcept's repeated

suggestions (e.g., at 4–5, 26, 53–56), merely describing an infringing use—without

encouraging it—is insufficient. *See HZNP*, 940 F.3d at 701–02.

b.     Corcept did not make the required showing. The district court

correctly found that Corcept's inducement arguments are foreclosed by *HZNP*.

That case held that a label stating "if you do X, then do Y" does not induce X, *see*

*id.*—a holding that squarely applies here. Teva's label does not encourage

physicians to co-administer mifepristone and strong CYP3A inhibitors. On the

contrary, the label warns *against* the practice—a point Corcept admitted when

prosecuting the asserted patents. The label simply provides dosing instructions for

physicians to follow *if* they, in their independent judgment, decide to co-administer

notwithstanding those warnings. That is not inducement.

Corcept's heavy reliance on *Vanda* is misplaced. In that case, administering

the product according to its FDA-approved indication led directly to infringement,

so an inference of specific intent was justified. That is not true here. A physician

administering mifepristone according to Teva's label's instructions will not and cannot infringe unless she decides also to co-administer a strong CYP3A inhibitor—something the label cautions physicians *not to do*.

To induce infringement of a method patent, one must encourage each step of the method. Corcept's failure to show that the label encourages co-administration is fatal to its inducement allegations on all asserted claims because they all require administering mifepristone together with a strong CYP3A inhibitor.

c.    The district court's no-inducement conclusion is further buttressed by its finding that Teva's product has substantial non-infringing uses. *See Warner-Lambert*, 316 F.3d at 1365 (presence of substantial non-infringing uses undercuts any inference of specific intent to induce infringement). Indeed, "substantial" is an understatement. So far as the evidence shows, there has *never* been an infringing use of Korlym, and there is no reason to expect anything different for Teva's mifepristone product. The district court did not clearly err in rejecting Corcept's implausible argument that Teva specifically intends to induce a method of administration that the materially identical Korlym label never has.

## STANDARD OF REVIEW

Following a bench trial, this Court "review[s] the district court's judgment for legal error or clearly erroneous findings of fact." *Genentech*, 55 F.4th at 1375.

20

"Infringement, including induced infringement, is a question of fact that [this Court] review[s] for clear error." *Id.* at 1375–76.

The clear-error standard of review "does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985). Rather, reversal is permitted only if "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* "A trial judge … who hears witnesses and initially assesses evidence deserves considerable latitude in making findings of fact, particularly scientific findings of fact." *Biovail Corp. Int'l v. Andrx Pharm., Inc.*, 239 F.3d 1297, 1303 (Fed. Cir. 2001). "[C]redibility determinations by the trial judge 'can virtually never be clear error.'" *First Interstate Bank of Billings v. United States*, 61 F.3d 876, 882 (Fed. Cir. 1995) (quoting *Anderson*, 470 U.S. at 575).

## ARGUMENT

I.  **The district court did not clearly err in finding that Teva's mifepristone product will not likely lead to direct infringement.**

It is well settled that proving inducement requires proving an underlying act of direct infringement. It is equally well settled that, in the Hatch–Waxman context, proving that predicate act means proving by a preponderance of the evidence that the accused product would infringe if put on the market. The district court found that Corcept did not make that showing here.

21

Corcept cannot show clear error in that finding, so Corcept tries to rewrite the law. Corcept attempts—in its own words (at 46)—to "'collapse'" the induced-infringement question "into one inquiry focused exclusively on" whether the label recommends infringement, without regard to other probative evidence. This Court's precedents—most recently, the 2022 *Genentech* decision—foreclose that rigid approach. Under the proper legal standard, the district court's finding that Corcept failed to prove direct infringement is amply supported by the record, including the evidence of physician practice and the product label itself.

### A. Corcept was required to show direct infringement as an element of its case, and its attempts to evade that burden fail.

#### 1. Corcept bore the burden to show it is more likely than not that Teva's product, if marketed, would perform all steps of the claimed method—an inquiry that requires analysis of all relevant evidence, including the label and physician practice.

The "case law leaves no doubt that inducement liability may arise if, but only if, there is direct infringement." *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 921 (2014) (cleaned up). To prevail on its inducement claim, then, Corcept had to show a predicate act of direct infringement. *See id.* at 920–21.

That Corcept brought this case under 35 U.S.C. § 271(e)(2) does not relieve Corcept of that burden. *See Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1568–69 (Fed. Cir. 1997). "[A]lthough the Hatch–Waxman Act provides that the filing of an ANDA … meets the technical jurisdictional requirement of infringement, that is

not the same as the direct infringement that serves as a predicate for finding induced infringement." *Genentech*, 55 F.4th at 1379. To show direct infringement, Corcept was required to "prove that the product that [Teva] ultimately would put on the market would likely infringe" Corcept's patents. *Glaxo*, 110 F.3d at 1567. That inquiry requires consideration of "all the relevant evidence, including [the] proposed label and physician practice." *Genentech*, 55 F.4th at 1380.

### 2. ***Genentech* forecloses Corcept's contention that Teva's label is "dispositive."**

While Corcept pays lip service to this principle, *see* Corcept Br. 30, Corcept's arguments are irreconcilable with it. Citing *Vanda*, Corcept contends (at 29, 32–35) that Teva's label is "dispositive" because (according to Corcept) Teva's label recommends an infringing use and no more is required to satisfy Corcept's burden. As an initial matter, the district court concluded—correctly—that Teva's label does *not* recommend infringement. *See supra* Statement of the Case; *infra* Section I.B.2.c; *infra* Section II. So Corcept's premise fails. More to the point, however, Corcept's reading of *Vanda* as "collaps[ing]" "the elements of induced infringement … into one inquiry focused exclusively on the language of the product label," Corcept Br. 46, was squarely rejected by this Court in *Genentech*— a case bearing close similarities to this one.

23

*Genentech* was a Hatch–Waxman lawsuit involving the drug pirfenidone, indicated to treat idiopathic pulmonary fibrosis, or "IPF." Genentech asserted three so-called "DDI claims" involving co-administration of pirfenidone and fluvoxamine, a strong CYP1A2 inhibitor. 55 F.4th at 1371, 1374. Genentech discovered that "[p]irfenidone is highly susceptible to drug-drug interactions with CYP1A2 inhibitors" and obtained claims "involv[ing] methods for administering pirfenidone to a patient taking fluvoxamine by either discontinuing fluvoxamine or modifying the dose of pirfenidone and continuing fluvoxamine." *Id.* at 1374. The three asserted claims recited (respectively) (i) discontinuing fluvoxamine and then administering pirfenidone to an IPF patient; (ii) co-administering fluvoxamine and 801 mg/day pirfenidone to an IPF patient; and (iii) reducing the dose of pirfenidone from 2400 mg/day to 800 mg/day when co-administering with fluvoxamine to an IPF patient. *Id.* at 1374–75. The accused Sandoz label stated that "concomitant administration of pirfenidone and fluvoxamine … is not recommended because it significantly increases exposure to pirfenidone." *Id.* at 1375. Accordingly, the label continued, "'discontinue fluvoxamine prior to administration of pirfenidone or reduce pirfenidone to 267 mg three times a day,' for a total of 801 mg/day." *Id.* (cleaned up).

"At the district court, Sandoz argued that there was insufficient evidence of direct infringement." *Id.* That "court agreed and added that the language in

24

Sandoz's label that encourages, recommends, or promotes an infringing use

without any additional evidence showing such an infringing use will in fact occur,

is insufficient for a finding of direct infringement." *Id.* In the district court's view,

"Genentech had not shown that any patient would be prescribed both pirfenidone

and fluvoxamine such that the methods of the DDI patents would even be

relevant," and, in any event, "if any IPF patient were prescribed fluvoxamine, a

physician would likely choose a non-infringing treatment adjustment over any of

the claimed methods." *Id.*

This Court affirmed. In doing so, it rejected Genentech's argument (nearly

identical to Corcept's argument here) that the district court "erred in concluding

that Sandoz's proposed label, which encourages, recommends, and promotes

infringement, is not dispositive." *Id.* at 1378. The dispositive issue, the Court

explained, is whether infringement is likely "if a particular drug were put on the

market"—an issue that "requires 'consideration of all the relevant evidence,'

including the proposed label's instructions and physician practice." *Id.* at 1379.

And, while a patentee need not prove past infringement to prevail in a

Hatch–Waxman case, "past conduct is relevant to what will happen in the future."

*Id.* The district court therefore "did not clearly err by considering all the relevant

evidence …. including testimony from physicians that, in their decades of treating

IPF patients, they had never prescribed pirfenidone to an IPF patient taking

fluvoxamine; and were they to find themselves in that position, they would choose a non-infringing response—*i.e.*, prescribing nintedanib [another drug used to treat IPF] instead." *Id.* And "[t]he court did not clearly err by considering physician evidence, weighing it against the language in Sandoz's proposed label, and finding that Genentech failed to prove direct infringement." *Id.*

*Genentech* eviscerates Corcept's argument that Teva's label is dispositive. In that case, both the district court and the Federal Circuit assumed certain language in Sandoz's label recommended infringement. *See id.* at 1375, 1378–79. Yet both courts *still* found no direct infringement, because Genentech failed to show that any future infringement was likely. *Id.* at 1380. This Court also declined to reach the issue of specific intent, underscoring that whether the label recommended infringement was irrelevant in view of the district court's supportable finding that direct infringement was unlikely. *Id.* at 1381.

It is thus decidedly *not* the law that "[w]hen the ANDA label instructs an infringing use, the elements of induced infringement do 'collapse' into 'one inquiry focused exclusively on the language of the product label,'" Corcept Br. 46. The district court correctly rejected this argument. *See* Appx26; *see also Takeda*, 785 F.3d at 634–35 (affirming district court's conclusion that patentee failed to carry its burden to "show likelihood of direct infringement," and therefore not "reach[ing] the question of whether there was evidence of inducement").

26

*Genentech* likewise rejected Corcept's reading of *Vanda* as holding that "the language of the label itself" can constitute direct infringement, Corcept Br. 30. As *Genentech* explained, *Vanda* found no clear error in the district court's finding that the patentee met its burden to show future infringement by introducing evidence that the generic's proposed label recommended the claimed method *and* evidence that physicians had actually practiced the elements of the asserted claims. *Vanda Pharms. Inc. v. W.-Ward Pharms. Int'l Ltd.*, 887 F.3d 1117, 1130–31 (Fed. Cir. 2018); *see Genentech*, 55 F.4th at 1380 (summarizing *Vanda*). What is more, *Vanda* reaffirmed the proposition that "'the infringement determination is based on consideration of all the relevant evidence.'" 887 F.3d at 1130 (cleaned up) (quoting *Ferring B.V. v. Watson Lab'ys, Inc.-Fla.*, 764 F.3d 1401, 1408 (Fed. Cir. 2014)). As the district court observed, "[t]here is nothing new about th[at] proposition." Appx27. *Vanda* thus did not hold that the label necessarily resolves the direct-infringement inquiry. Quite the opposite: *Vanda* emphasized the relevance of real-world practice. *See Genentech*, 55 F.4th at 1380.

Corcept contends (at 35–36) that it is "legal error" to "focus[] on 'information' outside the ANDA in cases where, as here, the ANDA directly answers the infringement inquiry." This argument is misplaced. In a case involving method patents, the ANDA does not necessarily answer the direct-infringement

27

question, because the patentee must show that the generic product would be used to practice the patented method. That is the lesson of *Genentech*.

The cases Corcept cites stand only for the proposition that a court may not assume that a generic company will manufacture something other than what it seeks approval to market in its ANDA. *See Par Pharm., Inc. v. Eagle Pharm., Inc.*, 44 F.4th 1379, 1384 (Fed. Cir. 2022) (finding non-infringement of claim requiring pH range of 3.7–3.9 where ANDA specifications "restrict[ed] the pH of the proposed product" to a different pH range); *Sunovion Pharm., Inc. v. Teva Pharm. USA, Inc.*, 731 F.3d 1271, 1280 (Fed. Cir. 2013) (finding infringement of claim requiring eszopiclone with less than 0.25% levorotatory isomer where ANDA specification defined generic product as "eszopiclone with 0.0–0.6% levorotatory isomer," which "indisputably include[d]" the claimed range); *In re Brimonidine Patent Litig.*, 643 F.3d 1366, 1377 (Fed. Cir. 2011) (district court erred by assuming that generic would manufacture a drug with a different pH than specified in its ANDA); *Abbott Lab'ys v. TorPharm, Inc.*, 300 F.3d 1367, 1374 (Fed. Cir. 2002) (finding infringement of claim requiring "a 1:1 molar ratio of sodium valproate and valproic acid" where ANDA defined the compound as comprising "sodium valproate and valproic acid in a 1:1 molar relationship"). In other words, if the ANDA specification defines the ANDA product "such that it must meet a

28

limitation of an assertion claim," a finding of infringement is generally proper. *Abbott*, 300 F.3d at 1373.

Corcept's argument is very different. Corcept is contending that courts may not look at real-world practice to determine whether future infringement of a patented method involving the ANDA product is likely. That position is illogical and squarely foreclosed by *Genentech*.

### 3. Corcept's assertion that the district court had to analyze the evidence in a specific order is meritless.

Corcept also contends (e.g., at 4, 29–30, 35–36) that, even if the direct-infringement analysis is not *limited* to the label, the district court had to at least *start* with the label. Corcept cites no authority for this proposition, and for good reason: no principle of law or logic required the court to canvass the evidence in any particular order. *Genentech* is again instructive: this Court's analysis of direct infringement focused almost exclusively on real-world physician practice and hardly mentioned the label. *See* 55 F.4th at 1380–81. The district court here began with the lack of evidence of direct infringement, but it did not end there: the court also considered both evidence of what would likely happen in the future *and* the content of Teva's label. Appx25–38. That mode of analysis was entirely proper.

Corcept rejoins (at 23, 43) that *Genentech* was different because there "the label[] specifically instructed against infringement." As an initial matter, to the

extent the label in *Genentech* warned against infringement, that would not distinguish it from this case because Teva's label likewise warns against infringement. Appx35. In any event, unlike in this case, parts of Sandoz's label *did* encourage infringement: one of Genentech's asserted patents required discontinuing fluvoxamine and then administering pirfenidone, and the label stated that co-administration of the two drugs was not recommended and instructed physicians to "discontinue fluvoxamine prior to administration of pirfenidone." 55 F.4th at 1375. If Corcept's label-takes-primacy-over-everything view of the law were correct, *Genentech* could not have come out the way it did.

### B. The district court supportably concluded that Corcept did not show direct infringement.

As the district court found, Corcept failed to prove that Teva's product, if marketed, "would likely infringe" Corcept's patents, *Glaxo*, 110 F.3d at 1567. That finding was not clearly erroneous. There is—undisputedly—no record evidence of past infringement, and the district court correctly found, after a comprehensive review of the evidence, that future infringement is unlikely.

One point bears emphasis at the outset. Corcept's assertion (at 21) that "[t]his was *not* a case that required resolution of conflicting expert testimony" is simply wrong. The district court denied summary judgment because it wanted to hear from the experts. Appx523. Having heard from them, the court repeatedly

30

found Teva's expert more credible. The court uniformly resolved conflicts between the expert testimony in favor of Dr. Snyder, on both the direct-infringement and specific-intent issues. *See* Appx11 (crediting Dr. Snyder's testimony that co-administration is rare); Appx30–31 ("[c]rediting Dr. Snyder's testimony … [that] it is highly unlikely that physicians will practice the claimed methods"); Appx32 (same); Appx38 (same); Appx33–35 (crediting as "persuasive[]" Dr. Sndyer's testimony that "physicians are unlikely to co-administer mifepristone and strong CYP3A inhibitors in the future because osilodrostat is a better drug to treat Cushing's syndrome"); Appx43 (crediting Dr. Snyder's testimony "that physicians would read Teva's label as a warning not to co-administer mifepristone and a strong CYP3A inhibitor"). Such credibility determinations "can virtually never be clear error." *Anderson*, 470 U.S. at 575. Indeed, *Vanda*—the case on which Corcept most heavily relies—emphasizes this point. 887 F.3d at 1131–32. And Corcept certainly cannot show clear error by block-quoting its own expert's testimony in its appellate brief, *e.g.*, Corcept Br. 33.

### 1. There is no evidence of past infringement.

So far as the evidence shows, not a single person has ever practiced Corcept's patents. Appx25; Appx29. That much is undisputed. Corcept's failure to adduce such evidence speaks volumes: it is hardly plausible to think Teva's label

will lead to infringement when the identical Korlym label—which has been around for almost five years—has not.[3]

Corcept's assertion (at 24, 41–42) that the district court erroneously *required* proof of past infringement is wrong. The district court did no such thing. The court stated—three times—that such evidence was not required. Appx25; Appx27; Appx30 n.6. It simply noted that the absence of such evidence is "relevant," Appx27, which it indisputably is under *Genentech*, *see* 55 F.4th at 1379. "Determining what will, or would, happen when a product enters the market requires consideration of all the relevant evidence, including the proposed label's instructions and physician practice." *Id.* at 1380 (cleaned up).

---

[3] Corcept's suggestion (at 35 n.3, 46–47) that it did not have sufficient opportunity to adduce evidence of past infringement because there were only 11 months between the release of the 2019 Korlym label and the end of fact discovery is meritless. Nearly all the evidence of co-administration Corcept put forward at trial came to light during *expert* discovery or shortly before trial. *See, e.g.*, Corcept Br. 39–40 (citing expert testimony about occasional co-administration); Appx29 (same). Corcept had four years to marshal its evidence; it was plainly not laboring under the misimpression that it could not supplement the record after fact discovery. (Indeed, as Corcept admits (at 47), it (unsuccessfully) tried to supplement the record *after trial* with a series of never-before-proffered conclusory hearsay declarations. Appx30 n.6.) The district court permissibly concluded that Corcept's failure to introduce evidence of direct infringement was not for lack of opportunity, but rather because infringement "is not likely" to happen. Appx30.

### 2.    Future infringement is unlikely.

In addition to noting the lack of evidence of past infringement, the district court found that future infringement is unlikely for several reasons. Those findings are well supported.

### a.    The district court supportably found that physicians wish to avoid co-administration of mifepristone and strong CYP3A inhibitors.

The district court credited Dr. Snyder's testimony that co-administration is generally undesirable "because of the challenges of dosing mifepristone and the dangers associated with co-administering the two substances." Appx31. Ample evidence supports that finding. It certainly is not clear error. *See Anderson*, 470 U.S. at 575.

Because mifepristone does not decrease cortisol levels, a physician administering mifepristone cannot measure cortisol to determine the proper dose. Appx1177–1178 (159:14–160:3) (Belanoff); Appx1428–1429 (384:24–385:20) (Snyder). Adding a strong CYP3A inhibitor to the picture complicates things further, because—as Dr. Carroll admitted—doing so can raise mifepristone blood levels and therefore increase the chances of dangerous and potentially fatal side effects. Appx1321 (303:9–22) (Carroll). So a physician would "be very afraid" to co-administer the two drugs. Appx32 (quoting Dr. Snyder's testimony). Indeed,

Corcept's own medical director stated that combination therapy of *any* kind is typically disfavored for Cushing's. Appx32 (citing Appx1098–1099 (96–97)).

The district court properly noted the "significan[ce]" of the fact that "Dr. Lynette Nieman, a leading authority on the treatment of Cushing's syndrome, did not mention combining mifepristone with other drugs in a topic review" published in a leading medical periodical. Appx33. The court "agree[d]" with Dr. Snyder "that the absence of any such discussion in sections of the topic review addressing combination therapy is telling": it strongly suggests that the combination is not a likely choice for treating physicians. *Id.* "Indeed," the court noted, "Corcept ha[d] no real response" to this point. *Id.* Corcept has no response on appeal either.

The arguments Corcept does advance on this issue mischaracterize the record. There is no evidence that "co-administration of mifepristone and a strong CYP3A inhibitor is 'often the best choice' for patients." *Contra* Corcept Br. 12 (capitalization omitted); *id.* at 13, 38. And the district court made no such finding. The quoted language is from a passage of the district court's opinion summarizing Dr. Belanoff's testimony that certain strong CYP3A inhibitors—*by themselves*—may be the "'best choice' for addressing a particular manifestation of Cushing's syndrome." Appx10. But it does not follow that *co-administration of strong CYP3A inhibitors and mifepristone* is "often the best choice" for Cushing's patients. The district court found otherwise, crediting Dr. Snyder: "the record

34

evidence demonstrates that physicians generally avoid co-administering

mifepristone and strong CYP3A inhibitors" to Cushing's patients. Appx31–32.

Corcept's contention (at 39) that "there is no dispute that doctors have

always 'desired' to co-administer mifepristone with strong CYP3A inhibitors" is

also false. That point was very much disputed, and the district court resolved the

factual dispute in Teva's favor. Appx32–33; *contra* Corcept Br. 9 (falsely stating

that it is "undisputed" that combining mifepristone and ketoconazole is a "logical

choice" today). The documents Corcept cites in support of this argument are from

over a decade ago, at the time of Korlym's approval. *See* Corcept Br. 39 (citing

FDA approval materials and associated testimony); *id.* at 9 (quoting article from

2013). The FDA did indeed predict in 2012 that there was a potential for co-

administration of mifepristone and strong CYP3A inhibitors. *See, e.g.*, Appx4468.

But the trial evidence showed the FDA's prediction was wrong. Over a decade

later, as the district court found, cases of co-administration are rare, and cases of

infringement are nonexistent. Appx29.[4]

---

[4] Corcept's reliance (at 19–20, 39) on Teva's arguments in the '214 patent
PGR is misplaced for similar reasons. That proceeding concerned obviousness,
which is assessed from the point of view of a skilled artisan at the time of the
invention. Teva argued that co-administration was obvious because the FDA stated
that it was likely when it approved Korlym in 2012. That is in no way inconsistent
with Teva's argument (and the district court's finding) that, as things have turned
out, co-administration is in fact rare and so is unlikely to occur in the future. The

Nor does Dr. Dobs' testimony aid Corcept's argument. *Contra* Corcept Br. 39–40. Dr. Dobs has treated about a hundred Cushing's patients but co-administered mifepristone and ketoconazole only "two to three times" (and never, as far as the record shows, in an infringing manner). Appx1053–1054 (51:24–52:8); Appx1060 (58:16–21). That hardly suggests that co-administration is likely or that doctors often want to do it. More to the point, even if Corcept had "introduced other evidence that could have supported a contrary finding" to the one reached by the district court, that "does not compel the conclusion that the district court clearly erred." *Vanda*, 887 F.3d at 1131–32.

Finally, Corcept's observation (at 48) that "[r]are infringement is still infringement" is beside the point. Co-administration, standing alone, is not infringement. Corcept's patents require co-administration in a specific order and at a specific dose. So the fact that *co-administration* may "rare[ly]" occur, Appx29, does not suggest that *infringement* is ever likely to occur. On the contrary, the infrequency of co-administration suggests the opposite. Appx28–29; Appx31–33.

---

district court plainly appreciated this point given its ruling in Teva's favor. *Contra* Corcept Br. 20 (incorrectly suggesting that the court found "clear inconsistencies in Teva's positions").

**b.    The district court supportably found that physicians are unlikely to find co-administration necessary given the availability of osilodrostat.**

The district court also credited Dr. Snyder's testimony that "physicians are unlikely to co-administer mifepristone and strong CYP3A inhibitors in the future because osilodrostat is a better drug to treat Cushing's syndrome." Appx33. That determination was not clear error. The evidence showed that osilodrostat is a powerful and effective drug that acts quickly and does not present the same safety risks when co-administered with strong CYP3A inhibitors. Appx1430 (386:19–22) (Snyder). Unlike mifepristone, osilodrostat inhibits the synthesis of cortisol, so a physician can readily determine the proper dose of osilodrostat by measuring cortisol levels. Appx1428–1430 (384:9-12, 386:17–19) (Snyder). The district court found "credible and persuasive" Dr. Snyder's testimony that a physician faced with a patient who needed both a strong CYP3A inhibitor and a treatment for Cushing's syndrome would have ample reason to select osilodrostat over mifepristone. Appx34.

Corcept quibbles with these findings in a footnote, arguing (at 49 n.6) that osilodrostat has a narrower indication than mifepristone and that the osilodrostat label recommends a large dose reduction when co-administered with strong CYP3A inhibitors. To the extent Corcept has not forfeited these arguments, *but see Roche Diagnostics Corp. v. Meso Scale Diagnostics*, LLC, 30 F.4th 1109, 1116

(Fed. Cir. 2022) (arguments raised in footnotes are not preserved), they are

meritless. Corcept lost this issue on the facts. The district court credited Dr.

Snyder's testimony that osilodrostat, while only indicated for the treatment of

Cushing's disease (a subset of Cushing's syndrome) is "widely used off-label for

Cushing's syndrome." Appx34 (citing Appx1518–1520 (474:2–15, 476:21–25)).

The court also credited Dr. Snyder's testimony that it is safer to administer

osilodrostat than mifepristone with a strong CYP3A inhibitor notwithstanding the

fact that osilodrostat blood concentration changes more in the presence of a strong

CYP3A inhibitor. *See* Appx33–34. That is because, with osilodrostat, a physician

can measure cortisol levels to determine whether the correct dose of the drug is

being administered. Appx1533 (489:10–24) (Snyder).

Corcept claims (at 48–49) to be unaware of "any authority … suggesting

that the presence of another drug on the market to treat some of the same patient

population ... is relevant to direct infringement in a Hatch-Waxman case."

*Genentech*, however, endorsed the district court's finding that direct infringement

was unlikely because a physician faced with "an IPF patient taking fluvoxamine"

would decline to prescribe pirfenidone (the drug at issue in the case) and

"prescrib[e] nintedanib" (another drug on the market used to treat IPF) "instead,"

because doing so avoided a potential pirfenidone-fluvoxamine drug-drug

interaction. *Genentech*, 55 F.4th at 1380. Similar reasoning applies here: the

38

evidence showed that a physician who needed to administer both a strong CYP3A inhibitor and a Cushing's syndrome treatment would have good reason to prescribe osilodrostat instead of mifepristone to avoid a potential drug-drug interaction between mifepristone and strong CYP3A inhibitors.

### c. The district court supportably found that Teva's label warns against co-administration.

Future infringement is unlikely for the additional reason that, as the district court found, Teva's label warns against co-administration of mifepristone and a strong CYP3A inhibitor. Appx35; Appx1437 (393:11–18) (Snyder); *infra* Section II. Section 2.5 states that the drugs should be used in combination only when necessary, as the blood concentration of mifepristone can rise. Appx1438–1443 (394:18–395:8, 399:4–12) (Dr. Snyder's discussion of the label). Sections 5.6 and 7.2 of the label contain warnings against co-administration. Appx1440 (396:14–18) (Snyder). And the medication guide—the portion of the label directed to patients— also contains warnings, telling patients there could be serious side effects when mifepristone is given with strong CYP3A inhibitors. Appx1441 (397:7–16) (Snyder); *see* Appx4056–4058. Dr. Snyder testified that, taken as a whole, "the label says to the physician, be scared. Be very scared. This could cause a problem." Appx1441 (397:17–22). The district court expressly credited this testimony. Appx32. It did not clearly err in doing so. *See Anderson*, 470 U.S. at 575.

39

> **d.   The district court supportably found that, in the unlikely event physicians co-administer the two drugs, they could follow the label's instructions without infringing.**

Finally, the district court observed that, even if a physician were to administer mifepristone and a strong CYP3A inhibitor together, Teva's label describes non-infringing ways of doing so. Appx35. Dr. Carroll admitted as much. Appx35–36; Appx1285–1286 (267:10–13, 268:5–12) (Carroll). Specifically:

- The label states that, if a physician administers mifepristone to a patient taking a strong CYP3A inhibitor, the physician should "start at a dose of 300 mg." Appx4043. That would not infringe. Appx35; *contra* Corcept Br. 50–51 (incorrectly stating that "for a patient already taking a strong CYP3A inhibitor, the label *only* recommends titrating to an infringing 900 mg dose").

- The label states that, if a physician administers a strong CYP3A inhibitor to a patient taking 300 mg mifepristone, the dose of mifepristone should not be changed. Appx4043. That would not infringe. Appx36.

- The label states that, if a physician administers a strong CYP3A inhibitor to a patient taking 600 mg mifepristone, the dose of mifepristone should be reduced to 300 mg. Appx4043. That would not infringe. Appx36.

In short, co-administration is highly unlikely and, even if co-administration happens, there are non-infringing ways to do it. The district court thus supportably concluded that future infringement is unlikely. Appx35–37.

Corcept protests (at 50) that there are not necessarily non-infringing options "for any given patient" because "there is only one appropriate dose of mifepristone for any given patient." The implication, apparently, is that infringement will

40

necessarily result from following the dose adjustments in Table 1 for some patients (those whose "only" appropriate dose is 900 mg or 1200 mg). This argument is flawed for multiple reasons.

As an initial matter, Corcept's premise is unsupported. Corcept cites testimony from Dr. Belanoff that Korlym patients have an "optimal dose." Appx1164–1665. But (i) that is not the same thing as saying there is "only one appropriate dose" of mifepristone for every Cushing's patient who also takes a strong CYP3A inhibitor and (ii) in any event, the district court was not required to credit Dr. Belanoff's testimony, *see Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1378 (Fed. Cir. 2011) (factfinder is "entitled to credit or discredit testimony before it").

The more fundamental problem with this argument is that Corcept did not show that "any of the three patient groups covered by the claims," Corcept Br. 50, is likely to be administered mifepristone and a strong CYP3A inhibitor in the first place. The district court found that this was *not* likely, both because co-administration is so unusual and because Corcept presented no "evidence regarding the average dose of Korlym that patients receive in practice, or the number of patients who have taken 300 mg, 600 mg, 900 mg, or 1200 mg of Korlym, or the number of patients who have taken Korlym together with ketoconazole [a strong CYP3A inhibitor]." Appx36–37.

41

Corcept does not and cannot show that finding was clear error. Instead, Corcept attempts (at 24–25, 35, 41–42) to twist it into a "requirement" that Corcept prove the "prevalence" of infringement. The district court imposed no such requirement. *Corcept* injected the idea of prevalence into the arguments by speculating that most Cushing's patients need 900 mg or 1200 mg mifepristone. The district court properly rejected this unsupported speculation, which further reinforced its finding that *any* future infringement is unlikely. Appx37. It neither stated nor implied that a finding of infringement would require most patients to infringe.

\* \* \*

The district court comprehensively analyzed the evidence, weighed the competing expert testimony, and concluded that Corcept failed to show that Teva's mifepristone product will lead to direct infringement. Corcept has not come close to showing that finding was clear error. This was a classic battle of the experts, and Corcept lost it on the facts. That is a sufficient basis for this Court to affirm.

## II. The district court did not clearly err in finding that Teva's label will not induce infringement.

### A. In the Hatch–Waxman context, inducement liability attaches only if the drug product label recommends, encourages, or promotes infringement; merely describing an infringing use is insufficient.

In Hatch–Waxman cases where "it is alleged that the drug label induces infringement by physicians[,] [t]he label must encourage, recommend, or promote

infringement." *Takeda*, 785 F.3d at 631. "The mere existence of direct infringement by physicians, while necessary to find liability for induced infringement, is not sufficient for inducement." *Id.* Instead, "specific intent and action to induce infringement must be proven." *Id.* (quoting *Warner-Lambert*, 316 F.3d at 1364). "This requirement of inducing acts is particularly important in the Hatch–Waxman Act context because the statute was designed to enable the sale of drugs for non-patented uses" even if it results in some infringing uses. *Id.* And— importantly for this case—"[m]erely describing an infringing mode is not the same as recommending, encouraging, or promoting an infringing use, or suggesting that an infringing use should be performed." *Id.* (cleaned up).

Corcept's framing of the legal standard contradicts the foregoing precedent. Corcept cites (at 4–5, 25, 53–56) cases, including the Supreme Court's decision in *Grokster*, noting that "instructing *how* to engage an infringing use" may supply evidence of inducement. And Corcept reasons from there that Teva's label must induce because it provides dosing adjustments that can lead to infringement if physicians decide to co-administer mifepristone and strong CYP3A inhibitors. In other words, Corcept is equating a description of infringement to inducement of infringement. *See* Appx1362 (318:13–17) (Carroll) (Corcept's expert stating his "understanding that if a package insert describes a patented method, that's enough for there to be liability for induced infringement"). The full context of *Grokster*'s

43

analysis and this Court's subsequent precedent demonstrate the error of Corcept's argument.

In *Grokster*, the Supreme Court explained that "[e]vidence of *active steps taken to encourage* direct infringement, such as advertising an infringing use or instructing how to engage in an infringing use, show an affirmative intent that the product be used to infringe." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005) (emphasis added). A "showing that infringement was encouraged overcomes the law's reluctance to find liability when a defendant merely sells a commercial product suitable for some lawful use." *Id.*; *see id.* at 937 (inducement requires "clear expression or other affirmative steps taken to foster infringement").

As this discussion shows, while instructions on "how to engage in an infringing use" may support a finding of inducement, they do so only if they "evidence 'intent to *encourage* infringement.'" *Takeda*, 785 F.3d at 631 (quoting *Vita-Mix*, 581 F.3d at 1329). Thus the rule that a mere description of an infringing use is not inducement. Something more—something that allows the court to infer that the defendant specifically intends to cause infringement—is required. *See id.*

As discussed below, the district court correctly found that Teva's description of infringing dosing regimens (among other dosing regimens) is just that: a description. Teva's label does not encourage co-administration of mifepristone and

strong CYP3A inhibitors, which every asserted claim requires. The "label does not outline any benefits of coadministration or indicate the circumstances in which the agents should be coadministered," but instead "warns physicians against coadministration." Appx42. Indeed, the idea that Teva intends its label to induce an infringing event that, so far as the evidence shows, has never happened—not in the forty years mifepristone has been used to treat Cushing's, not in the twelve years Korlym has been on the market, and not in the five years since the 2019 Korlym label was approved—is implausible.

**B.    The district court supportably found that Teva's label does not recommend, encourage, or promote co-administration of mifepristone and strong CYP3A inhibitors, as required by all asserted claims.**

To induce infringement of a method patent, one must encourage each step of the method. *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1219 (Fed. Cir. 2014). Here, to prove inducement, Corcept had to prove that Teva's label encourages co-administration of mifepristone and a strong CYP3A inhibitor. Corcept failed to do so.

### 1.    *HZNP* is dispositive.

As the district court correctly found, Appx39–45, this Court's decision in *HZNP* is directly on point and fatal to Corcept's infringement case. HZNP's patents claimed a method of (i) applying diclofenac to the knee, (ii) waiting for the treated area to dry, and (iii) applying sunscreen, insect repellant, or a second

medication to the treated area. 940 F.3d at 700–02 & n.10. Actavis's label instructed to apply diclofenac to the knee to treat osteoarthritis and to "[w]ait until area is completely dry before covering with clothing or applying sunscreen, insect repellant, cosmetics, topical medications, or other substances." *Id.* at 699–700. The district court granted summary judgment of no induced infringement because the "claimed method *require[d]* application of a second topical agent whereas the label *merely permit[ted]*, without encouraging, post-product application of sunscreen, insect repellant, or a second topical medication." *Id.* at 686, 700–01.

This Court affirmed. "Merely describing the infringing use, or knowing of the possibility of infringement, will not suffice" for inducement liability, the Court explained; "specific intent and action to induce infringement must be shown." *Id.* at 702. And Actavis's label only described infringement, without encouraging it. *Id.* The patent "require[d] three distinct steps": "(1) apply the inventive formulation, (2) wait for the area to dry, and (3) apply sunscreen, insect repellant, or a second topical medication." *Id.* The label, however, required only "the first step of this method, nothing else." *Id.* And the warning about waiting for the treated area to dry before subsequent application "operate[d] in an 'if/then' manner: *if* the user wants to cover the treated area with clothing or apply another substance over it, *then* the patient should wait until the area is dry." *Id.* This, the Court explained, did "not encourage infringement." *Id.* Instead, "the label merely

provided guidance to patients about what to do if the pat[i]ent desired to have anything come into contact with the knee after application of the medication." *Id.*

That holding squarely applies here. Appx40–41. The asserted patents require administration of a strong CYP3A inhibitor to a patient already taking mifepristone, or vice versa, along with an adjustment of the mifepristone dose. But Teva's label recommends only the administration of mifepristone and "nothing else," *HZNP*, 940 F.3d at 702. It does not recommend that the physician administer mifepristone *together with* a strong CYP3A inhibitor. Appx41. The warnings in the label regarding co-administration of mifepristone and strong CYP3A inhibitors are just that—warnings—and, like the warnings in *HZNP*, they operate "in an 'if/then' manner: *if* the user wants to [take a strong CYP3A inhibitor], *then* the patient should [reduce the mifepristone dose]," *HZNP*, 940 F.3d at 702. Table 1 of Teva's label is explicit on this point, reciting the "[a]djustment to dose of mifepristone tablets *if adding a strong CYP3A inhibitor.*" Appx4043 (emphasis added). That does not encourage infringement under *HZNP*.

The district court was thus entirely correct to find *HZNP* "instructive." Appx40–41. Indeed, Corcept's expert's testimony—including in response to the district court's own discerning questions—confirms that this case fits squarely within *HZNP*'s mold:

Q. I have one section there highlighted under the main title subtitle, saying: 'Dose adjustment required.' What does that mean?

A. That means that *if we're going to administer mifepristone together with a strong CYP3A inhibitor, that you need to make an adjustment in the dose of mifepristone*.

Appx1235 (217:19–24) (Carroll) (emphasis added).

THE COURT: If you're going to co-administer, you must do this? Is that how you interpret that?

THE WITNESS: That's how I would -- I think that's an even better interpretation.

Appx1374 (330:5–8) (Carroll). Dr. Snyder testified similarly. Appx1443 (399:4–8).

Corcept protests (at 55–57) that, in *HZNP*, the label made "two of the three patented steps … entirely 'optional.'" But that is no distinction at all. As the district court found, Appx40–42, Teva's label makes co-administration "optional" as well (indeed, the label goes further and advises against it, *infra* Section II.B.2). Corcept may disagree with that finding. *See* Corcept Br. 55–56 & n.9. But Corcept lost that argument on the facts, and Corcept cannot show clear error—indeed, it does not even try.

Corcept's other attempts to distinguish *HZNP* similarly lack merit. Corcept says (at 57) that, unlike in *HZNP*, "(i) Teva's label instructs there will be instances where it is 'necessary' to co-administer (§ 2.5); (ii) the label instructs that adjusting the mifepristone dose is 'required' when co-administering (Table 3); (iii) the only

48

recommended dosing instructions for co-administration to the three patient populations at issue are infringing (§ 2.5); and (iv) the label contains clinical data indicating it is safe to co-administer when following the 'required' dosage adjustments." Points (i), (iii), and (iv) are factually wrong, and points (i), (ii), and (iii) do not distinguish this case from *HZNP*.

Point (i) is wrong because the label does not say co-administration will ever be necessary. It simply provides recommendations about what to do *if* it is necessary. Appx42. Dr. Snyder, moreover, testified that co-administration would *never* be necessary because recently better alternatives have become available— testimony the district court found "credible and persuasive." Appx34 (citing Appx1454 (410:9–14)). Whether the label indicates to physicians that co-administration will be necessary is a question of fact, *see Vanda*, 887 F.3d at 1130– 31, and the district court resolved this dispute in Teva's favor. And this is no distinction with *HZNP* in any event because the plaintiff there made the exact same argument. HZNP contended that Actavis's label implied that "application of sunscreen is medically necessary" for patients who use diclofenac because the label instructed that diclofenac treatment could "result[] in an earlier onset of ultraviolet light-induced skin tumors." *HZNP*, 940 F.3d at 701 & n.11. *HZNP* rejected that argument, because the label nonetheless did not instruct application of sunscreen. *Id.* at 702. The Court should reject Corcept's analogous argument here.

49

As to point (ii): Teva's label does state that a dosing adjustment is "required" if mifepristone is administered with strong CYP3A inhibitors. But Actavis's label in *HZNP* "require[d]" waiting for the treated area to dry if the patient was to apply a second substance after the diclofenac. *Id.* That was not sufficient for inducement because the label did not recommend applying a second substance. So too here: Teva's label does not recommend co-administration, so Corcept's inducement case fails.

Point (iii) is wrong because the label contains non-infringing dosing instructions even for the "populations at issue," Corcept Br. 57. For example, the label recommends that, if mifepristone if given to a patient taking a strong CYP3A inhibitor, the patient start at 300 mg mifepristone—a dose that would not infringe. Appx35. And, even if it were correct, this point would not distinguish this case from *HZNP* because the only recommendation in Actavis's label for patients who wished to apply a second substance to their knee was an infringing one. 940 F.3d at 701. That was not enough for inducement in *HZNP*, and it is not enough for inducement here.

Finally, point (iv) is wrong because the evidence showed physicians would *not* read the label to suggest that co-administration is necessarily safe. Appx1446–1449 (402:13–405:10) (Snyder). Corcept's expert testified otherwise, but the

50

district court was not required to credit that testimony. *Star Scientific*, 655 F.3d at 1378. This was a battle of the experts, and Corcept lost.

In short, *HZNP* is on all fours with this case. The district court was right to view that decision as controlling.

### 2. Teva's label discourages co-administration, as the district court found.

To the extent there is any meaningful distinction between this case and *HZNP*, it is this: while Actavis's label was agnostic as to whether a second substance should be applied after the diclofenac, Teva's label actively discourages co-administering mifepristone and strong CYP3A inhibitors. Appx42–44. This is thus an easier case than *HZNP*.

The district court's finding on this score was amply supported. The court again credited Dr. Snyder, who explained that Teva's label "warns physicians *against* co-administration" because of the serious and potentially fatal side effects it can cause. Appx42–44 (citing Appx1437–1443 (393:11–18, 394:18–395:8, 396:14–18, 397:7–22, 399:4–12)). Teva's label supports Dr. Snyder's testimony. Section 2.5 notes that "strong inhibitors of CYP3A … may increase exposure to mifepristone" and instructs that "[m]ifepristone tablets should be used in combination with strong CYP3A inhibitors only when necessary." Appx4043; *see* Appx1438–1439 (394:18–395:8) (Snyder). The "Warnings and Precautions" and

51

"Drug-Drug Interactions" sections of the label have similar warnings. *See* Appx4044–4045; Appx4047; Appx1440–1441 (396:2–18, 397:17–22) (Snyder). Since all claims require co-administration—something the label *discourages*, not *encourages*—there can be no inducement. Appx42–44.

Corcept has no answer to this point, other than a half-hearted footnote protesting (at 55–56 n.9) that "[p]rescription drugs are always prescribed with caution." That truism does nothing to undermine the court's decision to credit Dr. Snyder's testimony that a physician consulting the mifepristone label would not only be *cautious* about co-administering mifepristone and strong CYP3A inhibitors; she would be specifically *dissuaded* from co-administration in view of the label's warnings. *See* Appx35; Appx42; Appx1443 (399:9–12) (Snyder).

The remainder of Corcept's response misses the point. Corcept repeatedly emphasizes (e.g., at 55) that Teva's label "require[s]" "infringing dosage adjustment steps … *when co-administering*" (emphasis added). But that statement elides the key problem with Corcept's case, which is that the label does not tell physicians to co-administer the drugs in the first place. Corcept is effectively ignoring the claim limitations requiring co-administration, which contradicts this Court's precedent requiring inducement of every step in the claimed method. *See Ericsson*, 773 F.3d at 1219. Corcept's position would also eviscerate the

longstanding rule that merely describing infringement is not the same as encouraging it. *See Takeda*, 785 F.3d at 631.

Corcept's criticism of (at 56) of the district court's purported "'whether to prescribe in the first place' standard" is misplaced. "The pertinent question," as Corcept acknowledges (at 54), "is whether the proposed label instructs users to perform the patented method." A generic drug label *does* instruct users to prescribe that drug. So if, for example, Corcept had patent claims directed to administer 300 mg mifepristone to treat Cushing's syndrome, Teva's label would induce infringement of those claims. *Cf. HZNP*, 940 F.3d at 702 (acknowledging that Actavis's label recommended the application of diclofenac). Corcept's musings that a patentee could never "meet the district court's standard" are thus ill-founded.

The problem for Corcept is that, because mifepristone has been used to treat Cushing's for decades, Corcept could not get such a broad claim. Instead, it had to settle for narrow claims that require not only administering mifepristone but also doing so together with a strong CYP3A inhibitor, in a specific order and at a specific dose. To show induced infringement of *those* claims, Corcept would indeed have to show that the label instructs users to prescribe the drugs together "in the first place." That is the lesson of *HZNP*, *see* 940 F.3d at 702, and that is the threshold showing Corcept failed to make here. Appx39–41.

**3.      Corcept itself told the Patent Office and this Court that the 2012 Korlym label—which tracks Teva's label in key respects—teaches physicians "to avoid use of mifepristone with strong CYP3A inhibitors."**

Dr. Snyder's testimony that the label discourages co-administration provides ample basis for the district court's finding that the label does not induce infringement. But the district court did not even have to take Dr. Snyder's word for it. During prosecution of these patents, Corcept *repeatedly* told the PTO that the label language in question warns against co-administration of mifepristone and strong CYP3A inhibitors. As the district court observed, this "history reinforces the [] conclusion that Teva's label … does not encourage" infringement. Appx43 n.8.

Specifically, the PTO issued several obviousness rejections based on, among other references, the 2012 Korlym label (Appx4212–4234). That label describes essentially the same steps described in the '214 and '800 patent, with one exception: the 2012 label instructed that, if mifepristone and a strong CYP3A inhibitor were co-administered, the dose of mifepristone should be limited to 300 mg (rather than 600 or 900 mg). *See* Appx4212; Appx4217; Appx4220–4221.

In response to those rejections, Corcept contended that the 2012 label taught skilled artisans "to avoid use of mifepristone with [strong] CYP3A inhibitors. Appx2272. Indeed, Corcept went so far as to say that the label "contraindicated" combining mifepristone and strong CYP3A inhibitors. Appx2579. To support these arguments, inventor Dr. Belanoff submitted a declaration characterizing the 2012

54

Korlym label's cautionary language as a "forceful" warning against co-administration. Appx2246–2249; *see* Appx15. He also framed the label's warnings against co-administration as operating in an "if/then," manner, stating "that mifepristone should be limited to 300 mg per day if administered with a strong CYP3A inhibitor." Appx2247; *see also* Appx3710 (Corcept arguing during prosecution of the '800 patent that the 2012 label "includes the clear statement that, if it is necessary to combine mifepristone with ketoconazole or other strong CYP3A inhibitor[s], 'the dose should be limited to 300 mg per day'").

Essentially the same warnings that Corcept once characterized as "contraindicate[ing]" co-administration of mifepristone and strong CYP3A inhibitors are found in Teva's label. The following table shows a comparison between the relevant sections, with differences highlighted:

| 2012 Korlym Label | Teva's Label |
|---|---|
| **Warnings & Precautions** ||
| "*Use of Strong CYP3A Inhibitors*: Concomitant use can increase mifepristone plasma levels significantly. Use only when necessary and limit mifepristone dose to 300 mg (5.6)." Appx4212. | "*Use of Strong CYP3A Inhibitors*: Concomitant use can increase mifepristone plasma levels. Use only when necessary and limit mifepristone dose to 900 mg (5.6)." Appx4040. |
| **Drug Interactions** ||
| "Caution should be used when Korlym is used with strong CYP3A inhibitors. Limit mifepristone dose to 300 mg per day when used with strong CYP3A inhibitors (5.6, 7.2)." Appx4212. | "Caution should be used when mifepristone is used with strong CYP3A inhibitors. Limit mifepristone dose to 900 mg per day when used with strong CYP3A inhibitors (7.2)." Appx4040. |

| § 5.6 Use of Strong CYP3A Inhibitors | |
|---|---|
| "Korlym should be used with extreme caution in patients taking ketoconazole and other strong inhibitors of CYP3A … as these could substantially increase the concentration of mifepristone in the blood. The benefit of concomitant use of these agents should be carefully weighed against the potential risks. Mifepristone should be used in combination with strong CYP3A inhibitors only when necessary, and in such cases the dose should be limited to 300 mg per day." Appx4217. | "Mifepristone should be used with caution in patients taking ketoconazole and other strong inhibitors of CYP3A … as these could increase the concentration of mifepristone in the blood. The benefit of concomitant use of these agents should be carefully weighed against the potential risks. Mifepristone should be used in combination with strong CYP3A inhibitors only when necessary, and in such cases the dose should be limited to 900 mg per day." Appx4044–4045. |
| § 7.2 CYP3A Inhibitors | |
| "Medications that inhibit CYP3A could increase plasma mifepristone concentrations and dose reduction of Korlym may be required. Ketoconazole and other strong inhibitors of CYP3A … may increase exposure to mifepristone significantly…. [E]xtreme caution should be used when these drugs are prescribed in combination with Korlym. The benefit of concomitant use of these agents should be carefully weighed against the potential risks. The dose of Korlym should be limited to 300 mg and used only when necessary." Appx4220–4221. | "Medications that inhibit CYP3A could increase plasma mifepristone concentrations and dose reduction of mifepristone may be required. Ketoconazole and other strong inhibitors of CYP3A … may increase exposure to mifepristone. Caution should be used when strong CYP3A inhibitors are prescribed in combination with mifepristone. The benefit of concomitant use of these agents should be carefully weighed against the potential risks. The dose of mifepristone should be limited to 900 mg, and strong inhibitors of CYP3A should be used only when necessary." Appx4048. |

As shown, Teva's label, like the 2012 Korlym label: (i) cautions against

concomitant use; (ii) permits concomitant use, despite these warnings; and

(iii) provides recommendations that, in Corcept's own words, explain how to dose

mifepristone "if a physician decide[s] to risk such co-administration of mifepristone with a [strong] CYP3A inhibitor." Appx2247.

To be sure, the labels are not identical. For example, the 2012 label's recommendation of "extreme caution" when co-administering was revised to "caution," and the allowed dose of mifepristone was increased from 300 to 900 mg. But it is not credible for Corcept to suggest that these changes transmuted the relevant passages from active *discouragement* to active *encouragement*. The far more reasonable conclusion is the district court's: the "forceful[]" warning against co-administration in the 2012 label, Appx2247, Appx1187 (169:24–170:6); Appx1196 (178:3–9); Appx1200 (182:19–20) (Belanoff), was revised to a less forceful warning—but still a warning nonetheless. *See* Appx42–43 n.8. As the district court observed, "[t]here is a rather significant difference between a warning and an instruction." *Id.* (quoting *United Therapeutics Corp. v. Sandoz, Inc.*, 2014 WL 4259153, at *18 (D.N.J. Aug. 29, 2014)).

In short, by Corcept's own admission, the 2012 label and Teva's label both warn against co-administration. So neither encourages infringement.

### 4.    *Vanda* is inapposite.

Corcept's strained analogy to *Vanda* (at 52–53) misses the mark. The patent there claimed a method of treating schizophrenia by (i) testing the patient to determine if they were a CYP2D6 poor metabolizer and (ii) administering a dosage

of iloperidone to the patient of 12 mg/day or less for poor metabolizers and 12–24 mg/day for non-poor metabolizers. 887 F.3d at 1121. The defendant's label instructed physicians to administer "12 to 24 mg/day" iloperidone and stated that "the 'iloperidone dose should be reduced by one-half for poor metabolizers of CYP2D6.'" *Id.* at 1131. The label also stated that "[l]aboratory tests are available to identify CYP2D6 PMs [poor metabolizers]" —a group that made up about 3–10% of the potential population. *Id.* This Court found no clear error in the district court's "finding that [this language] 'recommends that practitioners perform or have performed a genotyping assay to determine whether patients are CYP2D6 poor metabolizers'" and then administer 12 mg/day or less for poor metabolizers and 12–24 mg/day for non-poor metabolizers. *Id.* at 1131–32.

Thus, in *Vanda*, administering the product according to the approved indication led directly to infringement, for both poor metabolizers and non-poor metabolizers—which plausibly supported an inference that the defendant intended to induce infringement. *See id.* at 1132. Not so here. A prescriber administering mifepristone according to Teva's label may never co-administer a strong CYP3A inhibitor. Indeed, that is what the label recommends: physicians should avoid such co-administration if they can. And, even if co-administration occurs, it is possible

to faithfully follow the label's instructions and not infringe.[5]

### 5. Corcept's additional arguments concerning claim 6 of the '800 patent are meritless.

Corcept contends (at 27, 33, 59–60) that claim 6 of the '800 patent is somehow different because "all claim 6 requires is the administration of 900 mg of mifepristone to a patient who is already taking" a strong CYP3A inhibitor. This argument is hard to understand. The claim, on its face, requires the drugs to be given together. Indeed, the whole point of this patent was Corcept's allegedly surprising discovery that one could *co-administer mifepristone and strong CYP3A inhibitors* at higher doses than previously thought safe. *E.g.*, Appx1015 (13:18–21) (Opening); Appx1145–1173 (127:17–155:21) (Belanoff). The analysis for claim 6 is therefore no different: Corcept had to—but did not—prove that Teva's label encourages administering mifepristone and strong CYP3A inhibitors together.

### C. The district court's finding that Teva's product has substantial non-infringing uses further supports its no-inducement conclusion.

This Court's decision in *HZNP*, coupled with the district court's finding that the label does not encourage (and in fact discourages) co-administration is a

---

[5] If the label in *Vanda* had warned users that administration of iloperidone to poor metabolizers was dangerous and stated to avoid such administration unless necessary, Corcept's analogy might have more force. But the label did not say that. It just said to administer poor metabolizers a lower dose.

sufficient basis for affirmance. The district court's finding of no specific intent is further buttressed, however, by its analysis of non-infringing uses.

### 1.    Virtually all uses of Teva's product will be non-infringing.

The district court correctly concluded, citing *Warner-Lambert*, that the presence of many non-infringing uses of Teva's product further indicates that Teva does not intend to cause infringement. Appx44. As this Court has explained, "where a product has substantial noninfringing uses, intent to induce infringement cannot be inferred even when the defendant has actual knowledge that some users of its product may be infringing the patent." *Warner-Lambert*, 316 F.3d at 1365; *accord HZNP*, 940 F.3d at 702; *Vita-Mix*, 581 F.3d at 1329.

Indeed, to say that Teva's product has "substantial" non-infringing uses is a dramatic understatement. The record contains no evidence that anyone has *ever* practiced the patented methods in the forty years mifepristone has been used to treat Cushing's syndrome. Appx25–30.

Moreover, as discussed above, a physician can follow Teva's label and never infringe. If a physician administers mifepristone without co-administering a strong CYP3A inhibitor—i.e., just uses the drug for its FDA-approved indication—no infringement. If a physician administers a strong CYP3A inhibitor to a patient taking 300 or 600 mg mifepristone and follows the label's instructions—no infringement. Appx1289–1290 (271:19–272:17) (Carroll). And if a physician

administers mifepristone to a patient already taking a strong CYP3A inhibitor and

declines to titrate past 600 mg—no infringement. Appx1286 (268:5–12) (Carroll).[6]

### 2.    Corcept's contention that non-infringing uses are irrelevant to inducement is foreclosed by this Court's precedent.

Corcept says (at 26–27, 49–50, 59) that "[n]on-infringing alternatives are

legally irrelevant to induced infringement." This Court says otherwise. *See, e.g.*,

*HZNP*, 940 F.3d at 702 (finding no inducement because generic product had

substantial non-infringing uses, meaning "intent to induce infringement cannot be

inferred even [if the generic had] actual knowledge that some users of its product

may be infringing") (quoting *Warner-Lambert*, 316 F.3d at 1365). *Vanda*—the

case on which Corcept relies (e.g., at 59)—merely notes that the presence of non-

infringing uses is not *dispositive*. That is, one can be liable for inducement even if

the product has substantial non-infringing uses. *Vanda*, 887 F.3d at 1133. But it

does not follow that non-infringing uses are *irrelevant*. They are decidedly not.

The principle that the presence of substantial non-infringing uses can

undercut an inference of intent to induce rests on sound common sense. *See*

*Warner-Lambert*, 316 F.3d at 1365. And it applies with particular force here. Teva

---

[6] Corcept's contention (at 62) that "the district court's non-infringement finding for claim 6 turned *entirely* on its conclusion that non-infringing doses existed" is incorrect. The district court explained at length why Teva's label does not encourage co-administration. Appx38–44. That analysis applied to all asserted claims, because each requires co-administration. *See supra* Section II.B.5.

wishes to market its product with a label materially identical to the 2019 Korlym label. Yet there is no evidence that the 2019 label has led to a single act of infringement in four years. It is hardly plausible that Teva intends for its label to do something the identical Korlym label never done.

## CONCLUSION

This Court should affirm.

April 22, 2024

Respectfully submitted,

*/s/ John Christopher Rozendaal*

John Christopher Rozendaal
Michael E. Joffre
Uma N. Everett
William H. Milliken
Anna G. Phillips
Brady P. Gleason
STERNE KESSLER GOLDSTEIN &
  FOX PLLC
1101 K Street, NW
Floor 10
Washington, DC 20005
(202) 371-2600

*Counsel for Defendant-Appellee
Teva Pharmaceuticals USA, Inc.*

**FORM 19. Certificate of Compliance with Type-Volume Limitations**

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:**  24-1346

**Short Case Caption:**  <u>Corcept Therapeutics, Inc. v. Teva Pharmaceuticals USA, Inc.</u>

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑  the filing has been prepared using a proportionally-spaced typeface and includes  <u>13,991</u>  words.

☐  the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐  the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: <u>04/22/2024</u>

Signature:  <u>/s/ John Christopher Rozendaal</u>

Name:  <u>John Christopher Rozendaal</u>